May it please the court. My name is Anita Simons and I'm student co-counsel for the appellants we pronounce as the D'Hanshyan family. My co-counsel and I are law students from the University of Arizona College of Law, appearing here as part of the pro bono appellate project under the supervision of Dr. Willie Jordan Curtis. At the outset I'd like to reserve one minute for rebuttal. No, University of Arizona College of Law is in Phoenix? Tucson. Oh, Tucson. You're okay. Thank you. Are you going to be sharing oral argument with your co-counsel or are you going to be using the whole period? Yes, ma'am. To introduce my co-counsel and explain how we will be dividing our arguments, Carol Chagog will specifically address the evidence required by the immigration judge at the hearing. Brian Blem will address the alleged inconsistency in the testimony. I will present the pertinent facts and our rebuttal. All right, you'll have ten minutes all together. You know that. We are aware. Yes. Okay, go ahead. Thank you. Here are the pertinent facts. Sahak and Anush D'Hanshyan and their two children fled persecution in their home country of Armenia in 1994. The D'Hanshyan's are Baptists and they belong to a group of Jewish women. They were a group called Equal, which sought to promote religious tolerance. And as a result of their membership in their faith, they were subjected to harassment. They applied for asylum in the United States. And at the beginning of their asylum hearing, the immigration judge told them that the testimony alone would never be good enough. And you can find that in our excerpt of record at tab three. The D'Hanshyan's attempted to bring the proof that the IJ required. They brought a card for someone for him to call from the church we don't know in the United States or Armenia. We're unaware because that is not in the record. But it was brought as proof of their faith. And the IJ told them he was not going to call whoever was on that card. You can find that on the excerpt tab seven. During his testimony, Mr. D'Hanshyan provided several non-responsive answers. And the immigration judge... That does not mean that it would be the IJ's responsibility to do its own investigation and call people. That is not our contention. We merely illustrate the good faith attempt to bring in the evidence that was requested. The immigration judge asked during the hearing whether Mr. D'Hanshyan understood the interpreter. You can find that in tab three. And in tab six, you can find the IJ saying, write this down so they'll understand. That is a quote. We will argue that our clients didn't have a fair chance to present their case before the immigration judge. It is our contention that the immigration judge improperly required this family to provide outside proof of their testimony before he had a chance to hear their testimony and had any reason to disbelieve them and ignored the good faith attempt to provide the required evidence. The record is also replete with non-responsive answers and some circumstantial evidence that Mr. D'Hanshyan may not have understood what was being asked of him. Now, correct me if I'm wrong. Your client, you know, was given several continuances and then eventually became over the government's objection to get some proof of other than just saying, I don't know, I don't know, I don't know, I don't know, I don't know, I don't know. I'm Baptist, because the court had questions about, you know, he was a little bit sketchy on his reasons as to why he became a Baptist. And I think that he didn't, he couldn't even provide anything in this country about attending a Baptist church. Is that correct? It is correct that he didn't provide the letter and all the... Because the court just wanted something to say that other than, because otherwise anyone could come in and say, I'm a Baptist. This is correct. But he did attempt to provide the card, which was ignored. We must point out at this time that these directions to provide evidence were primarily directed at our clients instead of counsel. They, when he had a chance to hear their testimony and had any reason to testify, every time he said, I am a Baptist, the immigration judge said, where is your proof? And this is his good faith attempt to provide that proof. I'm sorry. We contend that the adverse credibility ruling is not supported by substantial evidence. And for that reason, we ask the court to remand for a new hearing. And I will defer to my co-counsel to begin our argument. Good morning. Good morning, Your Honors. The DeHonzean family did not have a fair opportunity to present their claim before the immigration judge. On August 13, 1998, which was about the fourth hearing in this case, the immigration judge, on the first substantive interaction with Mr. DeHonzean, asked him if he was of the Baptist faith. Mr. DeHonzean replied that he was. Based solely on this, the immigration judge asked Mr. DeHonzean for evidence. Do you have any proof? We submit to this court that that was an unreasonably heavy burden on our client. And after asking our client for that proof, the immigration judge... Well, why would that be an unreasonable burden when you consider that if you say you're a certain language, I mean, if you say that you're a certain religion, most people, you know, go to their church or, you know, whatever, their synagogue or whatever their place of worship, and somehow identify with people that are involved in it. I mean, being a certain religion is more than just saying, you know, I am a Baptist, I am Catholic, I am Jewish. Yes, Your Honor, it is more than that. And to require proof in and of itself is not incorrect. However, to require proof simply on the basis of saying, yes, I am a Baptist, without stating any reason for disbelieving Mr. DeHonzean, we submit that that was improper. And by doing so, he placed a heavy burden on our client. And after he asked our client for the proof, he even told our client's counsel he would not believe anything that he would have to say. By saying such things, he made it very clear that he was not going to believe our client and that he placed such a burden on our client that our client would have trouble meeting. Now, he did present a card to the immigration judge submitting to him, this is a number that you may call in order to establish that I am a Baptist, without giving any recognition to his good faith attempt to present that corroborating evidence. And by doing so... Well, but I guess from, if you look at it from a judge's perspective, if, you know, if someone, if I were a trial judge and someone said, I want you to call this witness, well, I would tell them no, too, because that would mean I would be involved in a phone conversation where the parties weren't present, they wouldn't know what was said, and then I would come back and give my rendition of that. So, I mean, there's a really good argument that it would be totally improper for the judge to conduct that outside investigation and ex-party contact. Yes, Your Honor, that is an argument that could be made. We submit that because he did state no without considering that it was a good faith effort, in his oral decision, he did not state anything to the record that our client presented a card in an effort to bring forth this evidence, and we ask that you remand for a new hearing, Your Honor. How many continuances did the court give your client? There were several from the time of May 1997 until May 1, 2001. So this went on for about four years? Yes, Your Honor. And you did not have a hearing for the court to decide whether he could establish his asylum claim, right? Yes, Your Honor, I did. Okay. Thank you. Your Honors, regarding the alleged inconsistencies relied upon by the immigration judge... Maybe just because we're recording this, you're the third of the people's names, then give me your name again. My name is Brian Blum. Okay. Thank you. Sorry about that. Regarding the alleged inconsistencies relied upon by the immigration judge in making his adverse credibility determination, it is our contention that those inconsistencies, because they are based on faulty testimony, cannot be relied upon to sustain an adverse credibility finding. In He v. Ashcroft, this Court stated that even if a translation does not give rise to a due process violation, that the evidence is credible, that a faulty translation may nevertheless undermine the evidence upon which an adverse credibility determination is based. Additionally, Your Honors, in Perrin's last door, V.I.N.S., this Court stated that inresponsive or unresponsive answers are circumstantial evidence of a faulty translation or translation problem. Let me ask you maybe a little different question. Assume that there was the evidence is credible. Isn't there a lack of evidence of past persecution that supported? I mean, I didn't see that this family had the kind of persecution that would justify relief. You got any say on that? Well, my say on that, Your Honor, I would begin by going back to the first instance of hearing in this case, which took place in August 1998, in which the immigration judge right after asking Mr. DeHanzean if he was a Baptist, demanded that Mr. DeHanzean prove it. And then the evidence from that point forward solely focused on that one point. So what you're saying is that the focus was on Baptist or not, and not on persecution. And the hearing went off on that, and if you got a new hearing, you could supplement the persecution evidence. Is that it? Correct, Your Honor. There was evidence presented in the May 2001 hearing of persecution. Most of that evidence, however, was given by Mrs. DeHanzean, and the immigration judge completely ignores that evidence in his determination. And he focuses instead, Your Honors, on Mr. DeHanzean and his responses to these answers. For example, the immigration judge asked Mr. DeHanzean if he had any problems in Armenia. Mr. DeHanzean stated, I have no problems in Armenia, they beat me, and things like that, completely ignoring the second portion of that phrase. And I see that I'm out of time. Well, but he also said that there was no showing that whatever problems he had were caused because of his religious beliefs. Excuse me, Your Honor? He also said that, the immigration judge said that he believed that whatever problems the male applicant had were not caused by his religious beliefs. Well, Your Honor, it is our contention that Mr. DeHanzean was suffering from difficulty understanding the immigration judge. And it does not take place in all of the hearings. There were different interpreters used in these hearings, but you can see a very big pattern of Mr. DeHanzean giving unresponsive answers to questions. For example, the immigration judge will be talking about Baptist faith, whereas Mr. DeHanzean will respond talking about government repression or a geographical term. I haven't lived there for four years, the four years I've been here. But for the record, there's substantial amount of evidence indicating Mr. DeHanzean was having difficulty understanding. Ms. DeHanzean, on the other hand, didn't have those problems, and if you look at her testimony, it is completely consistent with the application for immigration. Thank you, Your Honor. All right. Thank you for your argument. You've actually used all of your time, but I'll give you one minute for rebuttal. All right. Good morning, Your Honors. May it please the Court. My name is Debbie Messier, and I represent the Attorney General. This is an appeal of an adverse credibility determination with respect to Petitioner's applications for asylum, holding and protection under the Convention Against Torture, based upon their claim that they were persecuted on account of their alleged Baptist faith in Armenia. Because the record does not compel reversal of the immigration judge and board's decisions, we ask the Court to affirm the final order of deportation and deny the petition for review. Maybe you can focus on, I think appellants seem to be focusing on, that the Court was, well, I'll state sort of my understanding of their argument to some extent, that the Court seemed to be focused on whether he was a Baptist or not. And improperly shifted what they would say would be an impossible burden to the appellant to bring in corroborating evidence. So probably the area is, is corroborating evidence always required? Was it wrong for the Court to ask for that? Did the Court unnecessarily shift the burden, maybe respond to those issues? I'll be happy to, Your Honor. First of all, while corroborating evidence is not always required in asylum cases, as this Court has recognized, in this case it was proper for the Court to demand and require it, because of the significant inconsistencies before the Court. Respectfully opposing counsel have misapprehended the facts in the record. When the immigration judge asked, when he stated that there is no evidence of corruption in the record, the Court said that there is. And that their testimony was never going to be good enough. First, he had already had an opportunity to look at the petitioner's asylum application, where lead petitioner Sahak had said he was beaten unconscious because he was a Baptist in his home, and then retracted it without explanation when he was interviewed by an asylum officer. So that stark inconsistency was already before the immigration judge. Secondly, just before the immigration judge said their testimony was never going to be good enough, the Court said that there is no evidence of corruption in the record. And that their testimony was never going to be good enough, he had asked Mr. Zanzian, are you a Baptist in this country? And Mr. Zanzian responded, no. At that point, the immigration judge turned to their counsel and said, well, you're a good attorney, Mr. Fagan, their testimony is not going to be good enough here, you need to find something else to back up, support their claim. And we submit that was entirely proper in light of the immediate response, the immediately prior response of the petitioner, and the fact that the immigration judge said that there is no evidence of corruption in the record. And that the petitioner and that significant inconsistency that really undermined lead petitioner Sahak's credibility in this line of questioning. What about the argument that a lot of these inconsistencies were probably due to difficulties in translation? Yes, Your Honor. Two points on that matter. First, this Court lacks jurisdiction to review that new claim. Petitioners never raised it before the Board. The Board has never raised it before the Court. The agency has not had an opportunity to address and correct that problem. If it was a problem, that was a simple matter that could have easily been addressed. Secondly, as a factual matter, the record does not support petitioner's contention that there was faulty translation. I don't know if that's a, I don't know if, you know, in terms of exhaustion, I don't think they're making a separate claim. It's just a ground to support the, you know, the weakness in the credibility finding, right? Which is raised. That's certainly their argument, Your Honor. That's certainly the argument they've made in response to our exhaustion argument. However, it is an entirely new matter. And it is a matter that could have easily been rectified by the Board had it been brought to their attention. How many times were, did this matter go to court? Your Honor, it went to court eight times over four years. In this case, the immigration judge bent over backwards to accommodate Petitioner's claim. As a factual matter, just returning to the translation issue, Petitioners have not identified which translator was purportedly incompetent. Was there always a translator? There was always a translator, Your Honor, and there were four separate translators over this four-year proceeding. And furthermore, Petitioners themselves acknowledged that while Lead Petitioner apparently could not understand the translator, his wife, who one would assume understands a little better than Petitioner, was the only translator. And that really undermines their claim that the translator was at fault here. Either the translator was at fault, or Petitioner and his wife speak different languages. But whatever the case may be, she seemed to understand them with no problem. Your Honor, I've already pointed out the inconsistencies with respect to the claim that he was beaten unconscious and then his later unaccounted for retraction of that claim. I'd also like to point out that in his application... In that alone, let's just say that alone, in the asylum claim, when he was interviewed by the asylum officer, he said that he was beaten unconscious and then his later unaccounted for retraction of that claim. He was beaten unconscious because he was Baptist, and then he retracts it. No, Your Honor. He wrote in his asylum application, in a full paragraph, that he had been beaten unconscious because he was a Baptist in his home, and then when he appeared before an asylum officer, he retracted it. And you'll note in the administrative record, the asylum officer stamped retracted. I saw that in the record. So do you think that that alone would be enough to support the immigration judge's belief that he wasn't credible, from the standpoint that, you know, I mean, most people don't get confused about whether they were beaten or not. You know, that's kind of an experience that doesn't just go away. Absolutely, Your Honor. That is, it is unquestionably a significant inconsistency that destroys the integrity of the claim that he was beaten unconscious and then his later unaccounted for retraction of that claim. I don't believe petitioner's credibility. But apart from that, there were other inconsistencies. In his asylum application, he stated that he'd been born into a family of Baptists, that his parents and his grandparents were Baptists. Yet, during immigration proceedings, he testifies that he converted at age 16. The immigration judge asked him, which church did you convert in in Armenia? And he couldn't remember the name of the church. The immigration judge asked him, what was the procedure you went through for conversion? He couldn't remember what the procedure was. Was he asked questions about the Baptist faith in general to see if he knew anything about it? I believe, Your Honor, he did at one point ask questions about the fundamental principles of the Baptist faith. That was not his, and again, he couldn't describe them. That was not the only, you know, the only basis for the adverse credibility finding. That was one part of it. Well, after he withdrew that he was beaten, what evidence in the record is there of past persecution? The only evidence in the record is his wife's testimony that he was beaten. And his inconsistent testimony during proceedings, at some points he says he never suffered any problems because he was a Baptist. And then at other points he says he was beaten a few times. So it's not really clear what evidence there is of past persecution. There's certainly no consistent evidence of past persecution, Your Honor. A final, another inconsistency is his alleged membership in this group called EQUAL, the religious tolerance group in Armenia. Again, he mentioned it in his asylum application, but failed to ever discuss it again. It's, again, another point on which the adverse credibility finding was made. Now, did you say that in the record somewhere there was a statement by Mr. the petitioner that he doesn't think he, that anything happened because of his religious beliefs or something along those lines that I hear you say? Yes, Your Honor. That's on Administrative Record page number 120. The immigration judge asked him point blank, as a result of your beliefs, did you on any occasion have any religious beliefs? Did you have any problems? And Mr. Zantian said, no. Is that the end of the, if you believe that, would that be the end of the inquiry? It would be, it wouldn't be the end of the inquiry if there was some, if there was some credible and valid evidence that this individual just did not understand what was going on. But he was represented by counsel. He had proceedings continued over four years at eight different times over the strenuous objections of the on-call. And he was also represented by counsel in the case of the 9S, which believed that he was engaging in dilatory tactics to just wait out his father's immigrant petition that was pending at the time. But based on that no, combined with the lack of evidence of past persecution and the other significant inconsistencies in this record, the government believes that the matter is truly at an end at that point. Your Honor, I'd, with the Court's indulgence, I'd also like to address quickly the issue of the telephonic hearing. Opposing counsel has made much of the immigration judge's failure to call the name, the person listed on the card. First of all, there's no absolute right to a telephonic hearing in immigration court. The relevant regulations are at 8 CFR 1000.  First of all, the relevant regulations are at 8 CFR 1000, and 3.25C. Secondly, the immigration judge gave them a further 90-day continuance after that hearing for them to procure a statement or bring the witness to court. Who is this person whose phone number is given, supposed to be? Your Honor, we're not sure. It's not clear from the record. The most I could deduct from it was it was someone who was purportedly from their church here in the United States. But again, that's at odds with his earlier testimony that he was not a Baptist in the United States. So there was no improper behavior by the immigration judge with respect to that. It's entirely proper for the immigration judge to want to conduct his court in an orderly and efficient fashion, and to ask the immigration judge to call someone who was not on a witness list. There had been no discussion of telephonic witnesses before, was not proper, number one. And number two, they suffered no prejudice because they were, again, given a 90-day continuance to procure this witness. In sum, Your Honors, we would ask the Court to affirm the immigration judge and board's final order of removal and deny the petition for review. Thank you. Okay. Thank you. I'll tell you what I'd like you to address in rebuttal, and this is one of the fun things about oral argument, is you can have everything planned, but then you have to talk about what we want to talk about. And so don't feel like you're being picked on. It happens to everyone. They come with those plans. But here's why I want you to rebut this, because of what they focused on. You talked about a lot in your, there was a lot of discussion in the opening of appellant's argument about that the judge just wouldn't call this person on the phone. All right. Well, now, after you obviously sat there and you listened to the government's position, and the government pointed out a number of inconsistencies to this court about whether he was a Baptist or not. Now, if I were the judge in that case, I'd want to look at that person, because what would prevent in making that phone call, you could have your brother, you could have your friend, you could have anyone, you know, hello, this is pastor so-and-so, and as the judge, with all of those inconsistencies, I'd want to look at that person. I'd want to see everything that they had, just to avoid the situation that anyone could be on the other end of the phone and tell me that they were the person's pastor. Can you respond to that? Well, and that's a very understandable consideration. But when such requests for a witness are directed at someone who invariably does not speak English, who is not an attorney, who may not understand all the things that the court might consider in whether or not they would be willing to call someone on a phone to have them appear before a hearing, had he been an attorney or someone who was more savvy about the legal process, perhaps he would have understood all the considerations that you're making right now. But this is just a man who is seeking asylum, who has been told on numerous occasions, you must bring us a letter. And he has a lawyer, right? He has a lawyer who did not attempt to bring the letter. The request for the letter and the request for a witness were not directed at his attorney. If you look in the record, they were directed at him personally. You must, sir, bring a letter. But attorneys understand that. When your attorney is sitting next to you and said, this is what I want to see, you know, the inference from that, there's a pretty logical inference that the reason that there's no letter is your client couldn't get a letter because there isn't anyone like that out there. But it's also logical to see, if you look at the record, that there are things that should have been happening in that court that were not happening. And we understand that it is the burden of the respondent to make his claim for asylum. But we must understand also that since he is personally making that, you know, making this claim and personally having to find this letter and find someone in Armenia to send that letter. And if you look in the record, he states that he has no one in Armenia to send said letter. And the IJ did not address that in his oral decision. The fact that counsel failed to produce that letter was not in his oral decision. He said he was simply disinterested in the claim. All right. Well, I want to thank you for your oral argument, and that's going to conclude this case. It will be submitted at this time. I think both sides did an excellent job today, and the court appreciates the comments of both sides. Thank you. The matter stands submitted.
judges: Bright , Tashima, Callahan